Honorable David C. Bury, United States District Judge *787 The Court grants in part and denies in part the Plaintiffs' Motion for Summary Judgment. The Court finds the McKittrick policy is arbitrary and capricious, an abuse of discretion and otherwise not in accordance with law in violation of the APA. Therefore, the Court grants summary judgment for Plaintiffs under the APA. The Court finds that solely for the purpose of Section 7 of the ESA the Mexican gray wolf is treated as a species proposed to be listed, not as a threatened species. Therefore, the Court denies summary judgment for Plaintiffs and finds as a matter of law that Plaintiffs may not proceed under Section 7, with the failure to consult claim.
A.
Overview: Procedural posture of the case
"In United States v. McKittrick , 142 F.3d 1170, 1177 (9th Cir. 1998), the Ninth Circuit Court of Appeals determined that the knowledge element for the criminal misdemeanor offense of 'taking' an endangered species was: the defendant knew he was shooting an animal, and the animal shot was a Mexican wolf; 'McKittrick need not have known he was shooting a wolf to 'knowingly violate[ ]' the regulation protecting the experimental population.' Id. According to the court, Congress changed the wording of 16 U.S.C. § 1540(b)(1) in 1978 from 'willfully' to 'knowingly,' making the offense a general rather than a specific intent crime." (Order (Doc. 30) at 1.)
McKittrick's conviction on this instruction was affirmed by the Ninth Circuit Court of Appeals, and he petitioned for a writ of certiorari. The government responded in relevant part that it would no longer use the knowledge instruction approved by the Ninth Circuit Court of Appeals in McKittrick. It agreed that the intent of Congress in 1978 was to make it clear that the statute only required proof of general, not specific, intent. Nevertheless, the government believed the jury instruction approved in McKittrick wrongly defined the mens rea required for a misdemeanor conviction under section 1540(b)(1). It reasoned the more analogous mens rea requirement was found in a public welfare offense for knowing violations of an Interstate Commerce regulation, which required drivers of motor vehicles transporting any explosive liquids or poisonous gasses to avoid, so far as practicable, driving into or through congested thoroughfares or places were crowds are assembled. Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 342, 72 S.Ct. 329, 96 L.Ed. 367 (1952). The Supreme Court in Boyce found that the statute's element of intent defeated any argument that it was void for vagueness because to sustain a conviction, the government must prove that the driver could have taken another route which was both practicable and safer and that the driver knew of such a route and deliberately took the more dangerous route, or the driver willfully neglected to inquire into the relevant facts. In other words, "knowingly" means knowing the essential facts or willfully neglecting to inquire into them. (Administrative Record (AR) (Doc. 75), Ex. 3: DOJ Supreme Court Brief at 15-16; CM/ECF 75.3 at 19-20.)
The Supreme Court denied certiorari , and thereafter the Defendant, the Department of Justice (DOJ), notified all of its prosecuting attorneys to stop using and object to the jury instruction approved in McKittrick. In 1999, the DOJ distributed a memorandum instructing its prosecuting attorneys to request an instruction which requires the government to prove beyond *788 a reasonable doubt that a defendant knew the biological identity of the animal taken was a wolf. (AR (Docs. 75.4-75.7.)
The Plaintiffs ask the Court to find that the DOJ has adopted an ultra viries agency policy, meaning that the DOJ has adopted an agency policy exceeding its statutory authority. The Endangered Species Act (ESA) Section 11, 16 U.S.C. § 1540, provides penalties for "any person who knowingly violates any provision, and any provision of any regulation, issued under the [ESA]," including ESA's prohibitions against "taking" an ESA-listed species, 16 U.S.C. § 1538, defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The Mexican gray wolf is one of many animal species protected under the ESA.[1] Plaintiffs challenge the DOJ's McKittrick policy regarding the mens rea "knowingly" element of the offense, which includes both its proposed jury instructions and corresponding directives prosecuting cases only if there is evidence that the alleged shooter knew the biological identity of the animal at the time of the shooting.
Plaintiffs argue that the DOJ's adoption of the McKittrick policy violates the Administrative Procedures Act (APA) because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § § 702, 706(2)(A). To prove its APA claim, the Plaintiffs charge that the DOJ's adoption of the McKittrick policy is a complete abdication of its prosecutorial discretion as established under the law set out in the ESA and United States v. McKittrick, 142 F.3d 1170, 1177 (9th Cir. 1998). Additionally, the Plaintiffs claim that the McKittrick policy violates DOJ's responsibility under § 7 of the ESA to take no action which may adversely affect a threatened species without first consulting with the Fish and Wildlife Service (FWS).
In opposition to Plaintiffs' Motion for Summary Judgment, the Defendant reurges arguments made in its Motion to Dismiss, which may be properly reurged to the extent afforded by the differing standard of review on summary judgment. At summary judgment, the Court looks beyond allegations, and Plaintiffs must set forth by affidavit or other evidence specific facts establishing standing and other jurisdictional prerequisites. Plaintiffs bear the burden of establishing jurisdiction by a preponderance of admissible evidence. The Court will not, however, relook at conclusions of law made when it denied the Motion to Dismiss which did not turn on questions of fact.
B.
APA Reviewability: the McKittrick policy is an abdication of DOJ's criminal enforcement duties and responsibilities under Section 11 of the ESA
The Defendant again challenges this Court's jurisdiction under the APA to review the McKittrick policy because the DOJ has absolute discretion in deciding when to prosecute a crime, including the illegal taking of a Mexican gray wolf, and because the McKittrick policy is NOT a complete abdication of its duty and responsibility to enforce the criminal penalties *789 provision of the ESA for illegal takings of Mexican wolves.
Both parties agree that anything less than a complete abdication by DOJ of express duties required under the law, and the Defendant prevails on the APA claim. If Defendant prevails on this argument, the DOJ may nevertheless lose on the ESA claim that adoption and ongoing implementation of the McKittrick policy is a violation of DOJ's duty under Section 7(a)(2) of the ESA to enter into consultation with FWS regarding the significant adverse impact the policy has on the DOJ's efforts to conserve and protect the Mexican wolf.
According to the Plaintiffs, "Importantly, this is not a case in which Guardians challenges-or seeks judicial review of-any particular enforcement decision. Guardians acknowledge that, as a general rule, specific prosecutorial decisions that are made in individual cases-that is, whether the facts and circumstances of a particular case warrants enforcement action-are within the discretion of the Executive Branch, and are largely immune from judicial review." (Ps' MSJ (Doc. 87) at 1-2.) " "Rather, the complaint seeks a conventionally judicial determination of whether [a] certain fixed polic[y] ... followed by the Justice Department and the United States Attorney's office lies outside the constitutional and statutory limits of 'prosecutorial discretion.' " Id. (quoting Nader v. Saxbe , 497 F.2d 676, 679 (D.C.Cir. 1974) ). This was the narrow door left open by the Supreme Court in Heckler v. Chaney , 470 U.S. 821, 832, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), recognized by this Court when it found Plaintiffs had stated a claim under the APA and denied Defendant's Motion to Dismiss. (Order (Doc. 30) at 10-12.)
The Court's legal analysis in the Order denying the Motion to Dismiss bears repeating. First, there is a presumption for judicial review of agency actions, pursuant to the APA, 5 U.S.C. § § 702 and 704, which provide: "A person 'adversely affected or aggrieved' by agency action, including a 'failure to act,' is entitled to 'judicial review thereof,' as long as the action is a 'final agency action for which there is no other adequate remedy in a court.' " (Order (Doc. 30) at 11.) The Court does not reconsider the prior determination that the express adoption of the McKittrick policy by Memorandum issued February 12, 1999, was a final agency action. (Order (Doc. 30) at 18-20); (AR (Doc. 75-6) at 149-150.)[2]
The Court presumes judicial review exists but for the narrow exception, pursuant to § 701(a)(2) of the APA, for actions committed to agency discretion which applies when a statute is so broadly drafted that there is no law for the Court to apply. Then the agency has absolute discretion to act because there is no clear standard by which to assess the agency's exercise of its discretionary authority. So, there is a second presumption of non-reviewability over an agency's decision not to prosecute or enforce, whether through civil or criminal process, because such a decision is generally committed to an agency's *790 absolute discretion. Id. at 10-14 (citing Heckler, 470 U.S. at 831-32, 105 S.Ct. 1649 ).
Here, the nonenforcement decision is made by the Attorney General and the United States Attorneys, who have "broad discretion" to enforce the Nation's criminal laws which make the presumption against reviewability especially strong. (Order at 13 (citing United States v. Armstrong , 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (citing Wayte v. United States , 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) and quoting United States v. Goodwin , 457 U.S. 368, 380 n. 11, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982) ). "This broad discretion rests on the recognition that judicial review is particularly ill suited in assessing such factors as: the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan. Moreover, judicial supervision in this area has systemic costs such as delaying criminal proceedings, threatening to chill law enforcement by subjecting the prosecutor's motives and decision making to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." Id. (citing Wayte , 470 U.S. at 607, 105 S.Ct. 1524 )).
"Prosecutorial discretion derives from Article II, including the Executive Power Clause, the Take Care Clause, the Oath of Office Clause, and the Pardon Clause. 'The Executive's broad prosecutorial discretion and pardon powers illustrate a key point of the Constitution's separation of powers. One of the greatest unilateral powers a President possesses under the Constitution, at least in the domestic sphere, is the power to protect individual liberty by essentially under-enforcing federal statutes regulating private behavior-more precisely, the power either not to seek charges against violators of a federal law or to pardon violators of a federal law. The framers saw the separation of the power to prosecute from the power to legislate as essential to preserving individual liberty....' " Id. (quoting In re Aiken Cnty. , 725 F.3d 255, 264 (DC. Cir. 2013) (internal citations omitted).
"After enacting a statute, Congress may not mandate the prosecution of violators of that statute, and 'the remedy for executive branch abuses of the power to pardon or to decline to prosecute comes in the form of public disapproval, congressional 'retaliation' on other matters, or ultimately impeachment in cases of extreme abuse.' " Id. (citing In re Aiken Cnty., 725 F.3d at 266 ).
Nevertheless, the Executive Branch's power to prosecute is not wholly "unfettered." Id. at 14 (citing Wayte , 470 U.S. at 608, 105 S.Ct. 1524 (citing United States v. Batchelder , 442 U.S. 114, 125, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979) ). "[P]rosecutorial discretion only encompasses the Executive Branch's power to decide whether to initiate charges for legal wrongdoing and to seek punishment, penalties, or sanctions. It does not include the power to disregard statutory obligations that apply to the Executive Branch." Id. (citing In re Aiken Cnty. , 725 F.3d at 266 ). In other words, the Executive Branch may not re-write the statute.
Therefore, the presumption of non-reviewable prosecutorial discretion can be rebutted by proof that Congress intended to limit an agency's enforcement discretion, " 'either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue.' " (Order at 16 (quoting Big Country Foods v. Board of Educ. of Anchorage School Dist. , 952 F.2d 1173, 1176 (9th Cir. 1992) (quoting Heckler , 470 U.S. at 833, 105 S.Ct. 1649 )). "Alternatively, the presumption can be rebutted *791 where the agency has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibility. Id. (citing Big Country Foods Inc., 952 F.2d at 1177 (citing Heckler , 470 U.S. at 833 n. 4, 105 S.Ct. 1649 )). "In the latter, the statute conferring authority on the agency might indicate that such decisions were not committed to agency discretion." Id.[3]
"Either way, the Court looks to the statute to determine whether the presumption of non-reviewability has been rebutted. The Court can look 'in the statute itself [or] in 'regulations promulgated by an administrative agency in carrying out its statutory mandate.' " Id. (quoting Crowley Caribbean Transport v. Pena , 37 F.3d 671, 677 (D.C. 1994) (quoting Center for Auto Safety v. Dole , 846 F.2d 1532, 1534 (D.C. Cir. 1988) ). "
As noted in the Order denying the Motion to Dismiss, the Court looks to the statutory enforcement scheme, the Final Rule, and the ESA.
"ESA Section 11(b)(1) provides for criminal fines and imprisonment for 'knowing' violations of the Act. 16 U.S.C. § 1540(b)(1). Any person who 'knowingly' takes an endangered species 'shall, upon conviction, be fined not more than $50,000 or imprisoned for not more than one year, or both.' This is a Class A misdemeanor, 18 U.S.C. § 3559(a)(6), therefore pursuant to 18 U.S.C. § 3571(b)(5),[4] the maximum fine for an individual is actually $100,000. 'Any person who 'knowingly violates' a regulation extending the take prohibition to a threatened species 'shall, upon conviction, be fined not more than $25,000 or imprisoned for not more than six months, or both,' 16 U.S.C. § 1540(b)(1), which is a Class B misdemeanor." (D's Response (Doc. 89) at 3.)[5]
ESA Section 11(a) authorizes the Secretary[6] to assess civil monetary penalties for "knowing" takings in violation of ESA in the amount of $25,000 for each violation, increased to $50,276, or "knowing" takings in violation of ESA regulations in the amount of $12,000 for each violation, increased to $24,132, and includes a provision allowing the Secretary to impose against "[a]ny person who otherwise violates any provision of [the ESA], or any regulation ..." a civil penalty of not more than $500 for each such violation, increased to $1,270 for each violation. 16 U.S.C. § 1540(a)(1) ; 50 C.F.R. § 11.33(c) (the Federal Civil Penalties Inflation Adjustment Act of 1990).
The McKittrick policy applies to 16 U.S.C. § 1540 for Class B misdemeanor violations for illegally taking an animal listed as threatened under ESA. The Mexican wolf is a nonessential experimental population, regulated pursuant to § 10j of the ESA, 50 C.F.R. § 17.84(k), and treated *792 as a threatened species for purposes of applying the enforcement provisions at issue in this case. These offenses are prosecuted by the Defendant, the DOJ.[7]
"The statute expressly provides for the affirmative defense of self-defense or defense of another, but mistake or accident is not a defense to the misdemeanor charge of knowingly shooting a Mexican gray wolf." (Order (Doc. 30) at 17 (citing McKittrick, 142 F.3d at 1177 ) (relying on United States v. St. Onge, 676 F.Supp. 1044, 1045 (D. Mont. 1988) (critical issue is whether act was done knowingly, not whether defendant recognized what he was shooting; claim of accident or mistake only if he did not intend to discharge his weapon or weapon malfunctioned)), see also 16 U.S.C. § 1540(b)(3) (good faith belief acting in self-defense or defense of other).
"[T]he Final Rule governing the Mexican gray wolf conservation program requires a vigorous prosecution component, specifically designed by Congress to reach even shootings done by mistake so that shooters have the responsibility to be sure of their targets, 50 C.F.R. § 17.84(k)(15),[8] and, defines an unintentional take as 'not by poisoning or shooting,' 50 C.F.R. § 17.84(k)(3)[9] .' " (Order (Doc. 30) at 17.)
The Defendant argues that the Rule provides broad prosecutorial discretion because it does "not address which shootings are subject to criminal penalties as compared to civil or administrative penalties; each incident of take will be investigated and determinations regarding those investigations will be made on a case-by-case basis. Nothing in this rule predetermines the outcome of an investigation into the take of a Mexican wolf.' " (Objection (Doc. 89) at 4 (quoting 80 Fed. Reg. at 2534.)
This discretion does not, however, negate the broad sweep of protections afforded ESA listed species. In TVA v. Hill , 437 U.S. 153, 180, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), the Supreme Court described the ESA as: "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."
*793 Babbitt v. Sweet Home Chapt. of Comm. for a Great Oregon, 515 U.S. 687, 698, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (describing holding in Hill ). "Whereas predecessor statutes enacted in 1966 and 1969 had not contained any sweeping prohibition against the taking of endangered species except on federal lands, ..., the 1973 Act applied to all land in the United States and to the Nation's territorial seas." Id. The Court explained that "as stated in § 2 of the Act, among its central purposes is 'to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved....' 16 U.S.C. § 1531(b)." Id. at 698-699, 115 S.Ct. 2407 (quoting Hill, 437 U.S. at 184, 98 S.Ct. 2279.) Both the holding and the language in Hill "stressed the importance of the statutory policy. 'The plain intent of Congress in enacting this statute,' we recognized, 'was to halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute.' " Id. at 699, 115 S.Ct. 2407 (quoting Hill, 437 U.S. at 184, 98 S.Ct. 2279 ).
The presumption of non-reviewability is rebutted if the substantive statute provides guidelines for the agency to follow in exercising its enforcement discretion. (Order (Doc. 30) at 12 (citing Heckler , 470 U.S. at 832-33, 105 S.Ct. 1649 )). " 'Congress did not set agencies free to disregard legislative direction in the statutory scheme that the agency administers.' " Id. (quoting Heckler, 470 U.S. at 832-33, 105 S.Ct. 1649 ).
Accordingly, the Court considers whether the substantive statutory scheme set out above provides guidelines for a vigorous enforcement scheme the DOJ must to follow in exercising its enforcement discretion. Specifically- in this case, the presumption of non-reviewability applies unless the DOJ's McKittrick policy was based solely on the agency's belief that it lacked jurisdiction to take action or if the agency consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities." Id. (citing Heckler, 470 U.S. at 833 n. 4, 105 S.Ct. 1649 )). If the McKittrick policy is an enforcement decision rather than a decision to not act,-then "the presumption of non-reviewability does not apply ... because when 'an agency does act to enforce, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner.' " (Order (Doc. 30) at 11 (quoting Heckler , 470 U.S. at 832, 105 S.Ct. 1649 )).
As explained below, the Court agrees with Plaintiffs that the McKittrick policy is outside the range of prosecutorial authority set out in ESA's comprehensive conservation scheme because it eviscerates the deterrent effect of the ESA criminal enforcement statutes. In other words, prosecutions prevented by the McKittrick policy result in little to no protection for the Mexican wolf and cause direct and real harm, which is neither speculative nor conjectural, to this protected species. (Ps' MSJ, SOF ¶¶ 11, 15-17, 21-28, 31-33. 36-49.)
As described herein, the Court finds that the ESA statutory enforcement scheme and history supports this conclusion. Additionally, both federal and state wildlife officials have recognized and admitted that the failure to end the McKittrick policy could undermine reintroduction programs for the wolves and jeopardize recovery efforts. Id. ¶¶ 24, 26, 31.
Plaintiffs submit that notably when the DOJ issued the McKittrick policy, it admitted it was creating a "hole' in criminal enforcement of the ESA's take prohibition, but DOJ believed "there [was] little hope of restoring the Ninth Circuit's interpretation of the necessary elements" of the ESA's criminal enforcement provision *794 "[a]bsent a legislative fix." Id. 11. The Plaintiffs assert the DOJ was wrong in this conclusion. The Court agrees.
Plaintiffs do not seek to limit DOJs prosecutorial discretion. Instead, as explained below, the McKittrick policy narrows the discretion afforded the DOJ under the ESA enforcement statutes, which Congress deemed necessary to successfully carry out ESA's comprehensive conservation goals.
1. The Law: United States v. McKittrick , 142 F.3d 1170 (9th Cir. 1998)
The first question is whether or not McKittrick remains good law. Under McKittrick "knowingly" refers to the knowing commission of an act of taking, which "means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "[T]he defendant knew he was shooting an animal, and the animal shot was a Mexican gray wolf." (Order (Doc. 30) at 1.) The government was not required to prove the defendant knew the biological identity of the animal at the time he shot it. Id.
In addition to express statutory language and ESA's legislative history, the McKittrick court relied on earlier cases interpreting "knowing" violations of 16 U.S.C. § 1540(b)(1), as follows:
[T]he District of Montana had already decided the intent issue in the government's favor, holding on similar facts that "[t]he critical issue is whether the act was done knowingly, not whether the defendant recognized what he was shooting." United States v. St. Onge , 676 F.Supp. 1044, 1045 (D.Mont.1988) ; see also [United States v. ] Billie , 667 F.Supp. [1485], 1493 [ (S.D. Flor. 1987) ] ("[T]he Government need prove only that the defendant acted with general intent when he shot the animal in question."). The Fifth Circuit has reached the same conclusion in related situations. See United States v. Nguyen , 916 F.2d 1016, 1017-18 (5th Cir.1990) (sustaining possession conviction did not require that defendant know animal's ESA-protected status); United States v. Ivey , 949 F.2d 759, 766 (5th Cir.1991) (citing St. Onge and Billie in holding that, like § 1540(b)(1), § 1538(c) is a general intent statute). The Eleventh Circuit has expressed its agreement with the reasoning of these cases in holding that an analogous provision of the African Elephant Conservation Act requires only general intent. See United States v. Grigsby , 111 F.3d 806, 817 (11th Cir.1997).
McKittrick , 142 F.3d at 1177.[10]
McKittrick is in keeping with the mens rea treatment of knowingly as used in other criminal enforcement statutes promoting conservation. When a court interprets statutory language, it looks to statutes dealing with similar subject matter and should interpret them harmoniously. Tides v. The Boeing Co., 644 F.3d 809, 814 (9th Cir. 2011). For example, the Migratory Bird Treaty Act (MBTA), 16 U.S.C. § 707(b), includes a felony offense for knowingly selling or taking with intent to sell a migratory bird and the Bald and Golden Eagle Protection Act (BGEPA)
*795 prohibits taking of a bald eagle knowingly or with wanton disregard for the consequences of the act.
In United States v. Pitrone , 115 F.3d 1, 4-5 (1st Cir. 1997), the defendant was convicted of a felony violation of the MBTA and on appeal, the defendant argued that he did not know that the bird he sold was a "migratory bird" and so could not be convicted because of his ignorance of the facts. The court rejected his argument, relying on a congressional amendment to the MBTA in 1986 expressly adding "knowingly" when before the statute had not included any scienter requirement whatsoever. According to the appellate court, Congress' amendment to expressly insert the word "knowingly" reflected their intent to only "require proof that 'the defendant knew (1) that his actions constituted a taking ... and (2) that the item so taken ... was a bird or portion thereof.' " Congress had warned that "it is not intended that proof be required that the defendant knew the taking ... was a violation of the subchapter, nor that he know the particular bird was listed in the various international treaties implemented by this Act." (Ps' MSJ (Doc. 87) at 11 (quoting Pitrone, 115 F.3d at 5 (citing 1986 U.S.C.A.A.N. 6113, 6128.1), see also, United States v. Zak, 486 F.Supp.2d 208, 211, 217-219 (D.Mass. 2007) (finding BGEPA obviously public welfare statute and equally obvious that "knowingly" does not require government to prove a defendant knew the bird he was shooting was an eagle; knowingly only refers to defendant's deliberative behavior in shooting, not to his state of awareness as to specific identity of the bird he shot).
The jury instructions approved in McKittrick were as follows:
No. 19: The government is not required to prove the defendant knew the animal at issue was a wolf or that it was a threatened species. The government need only prove that the defendant knowingly took or possessed an animal and that as a factual matter it was a wolf (canis lupus).
No. 20: The term "knowingly," as used in these instructions to describe the alleged state of mind of the defendant, means that he was conscious and aware of his actions or omissions, and realized what he was doing or what was happening around him.
(Ps' MSJ (Doc. 87) at 14 (quoting U.S. Ninth Circuit Brief in McKittrick ).
In summary, the instruction approved in McKittrick requires the jury to find "the defendant knowingly engaged in the taking of an animal" and proof that "the animal taken was a threatened species of wildlife, namely a gray wolf." (Administrative Record (AR) (Doc. 75-3): Supreme Court Answering Brief at 14.) The government does not need to prove the defendant knew that killing an endangered or threatened species was illegal or that the animal he or she shot was protected under the law. The responsibility for any mistake falls on the defendant.
2. The McKittrick policy[11]
The McKittrick policy is to the contrary. The DOJ believes that the mens *796 rea instruction approved by the Ninth Circuit Court of Appeals "does not adequately explicate the meaning of the term 'knowingly' in Section 1540(b)(1)" because in "an analogous public welfare misdemeanor offense involving the violation of a regulation, [the Supreme Court] has held that a 'knowing' violation of the regulation occurs if the defendant either knew the essential facts or 'willfully neglected' to exercise its duty under the Regulation to inquire into the relevant facts." (D's Objection (Doc. 89) at 5 (quoting AR (Doc. 75-3): Supreme Court Answering Brief at 16) (citing Boyce , 342 U.S. at 342, 72 S.Ct. 329 (finding statute not void for vagueness, but to sustain conviction government must prove not only that another route could have been taken and must also show that alleged violator knew that there was a safer alternative route or willfully neglected to inquire into availability of safer route); cf. Staples v. United States , 511 U.S. 600, 616-619, 620, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) (discussing intent required in public welfare statute creating a serious *797 felony offense)). On appeal to the Supreme Court, it was the government's position that "the term 'knowingly' in Section 1540(b) [had] a similar scope." (AR (Doc. 75-3): Supreme Court Answering Brief at 16.) Therefore, even though it had prevailed below, the government asked the Court to decline review of this issue, id. at 15, because it would not seek the McKittrick instruction in the future. Id.
Under the McKittrick policy, the jury must find beyond a reasonable doubt "that the defendant did knowingly take within the United States a wolf, that the animal taken is in fact a Mexican wolf," and "was taken unlawfully, that is, without permission from the United States Department of the Interior." (AR (Doc. 75-7): Jury Instruction.) The instruction explains: "An act, such as a 'take' ..., is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident. You may consider evidence of the defendant's words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly. You may, but are not required to infer that the defendant acted knowingly if you find that the defendant knew that the animal he took looked like a wolf." Id. "You are further instructed that the term 'knowingly' does not require the government to prove that the defendant knew that the animal in question was protected under federal law. Furthermore, you are instructed that the use of the term 'knowingly' does not mean that the government is required to prove that the defendant knew that the act he 'knowingly' committed constituted a violation of law. In other words, the government isn't required to show that the defendant knew his conduct was illegal or unlawful." Id.
The instruction, optionally, covers "deliberate ignorance": "You also may infer that a defendant acted knowingly if you find beyond a reasonable doubt that the defendant was aware of a high probability that the animal taken was a wolf and that the defendant deliberately avoided learning the truth. The element of knowledge may be inferred if the defendant deliberately closed his or her eyes to what would otherwise have been obvious to him or her. You may not find that the defendant acted knowingly, however, if you find that the defendant actually believed that the animal taken was not a wolf. A showing of negligence, mistake, or carelessness is not sufficient to support a finding of knowledge." Id.
Plaintiffs' argument is that if the DOJ got the law wrong, it has not exercised prosecutorial discretion but has instead not prosecuted wolf-cases based on a belief that it lacks authority under the law to enforce the broad criminal liability laws adopted under ESA, as identified in McKittrick. Necessarily, the narrow construction of criminal liability under the McKittrick policy, which DOJ has consciously and expressly adopted, is a complete abdication of DOJ's statutory responsibility under ESA.
As this Court noted when it considered the Defendant's Motion to Dismiss, it is the province and duty of this Court to say what the law is or is not. (Order (Doc. 30) at 19 (citing United States v. Nixon, 418 U.S. 683, 704-05, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) ). In exercising this authority, this Court is bound by Ninth Circuit law and McKittrick, unless intervening Supreme Court law has effectively overruled it. Miller v. Gammie, 335 F.3d 889, 899 (9th Cir. 2003) ; Galbraith v. County of Santa Clara, 307 F.3d 1119, 1123 (9th Cir. 2002).
The Court looks first at the cases relied on by the government in 1998 when it asked the Supreme Court to not grant certiorari in McKittrick on this issue: Boyce , 342 U.S. at 342, 72 S.Ct. 329 ; cf.
*798 Staple , 511 U.S. at 616-619, 114 S.Ct. 1793, and the government's assertion that United States v. Nguyen, 916 F.2d 1016 (5th Cir. 1990) did not address the question of whether it must be proved that the defendant knew the identity of the animal. None of these cases are intervening Supreme Court law and, therefore, cannot overrule McKittrick.
Defendants argue that it does not ask this Court to overrule McKittrick. "Rather, DOJ's position is that it is highly uncertain whether the Supreme Court would affirm a conviction obtained under the McKittrick instruction, and in light of that uncertainty, it is reasonable for DOJ to devote its limited resources to pursuing cases that are more likely to be sustained, and less likely to subject citizens to erroneous fines or imprisonment." (D's Objection (Doc. 89) at 28.) "In every prosecution, the trial court retains the power to decide what jury instructions are legally warranted and appropriate on the facts; it is not bound by the government's view of the law." (D's Objection (Doc. 89) at 28 (citing cf. United States v. Apel, --- U.S. ----, 134 S.Ct. 1144, 1151, 186 L.Ed.2d 75 (2014) ). This latter assertion ignores the substance of the Plaintiffs' challenge which is aimed at the former assertion, which is that the McKittrick policy is a formally adopted prosecutorial policy that is contrary to the law and in direct contradiction to ESA mandates. The McKittrick policy, implemented as a prosecutorial policy, moots the power retained by the trial courts to say what the law is and ensures they will not be afforded opportunities to decide what law is warranted and appropriate on facts analogous to those that existed in McKittrick.
The Court turns to that question: whether Section 11 of the ESA requires knowledge of the facts constituting the offense.
There are either general or specific intent crimes, depending on whether the mens rea is "knowingly" or "willfully." Specific intent offenses are reflected by requiring a mens rea of willfulness, meaning the defendant knew his conduct was unlawful, but does not require proof of a defendant's knowledge of the specific law he or she violates. Bryan v. United States, 524 U.S. 184, 192, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998) ; United States v. Mousavi, 604 F.3d 1084, 1092 (9th Cir. 2010). The Supreme Court has described the element of "knowingly" as referring "to general knowledge of the facts constituting the offense as distinguished from knowledge of the law." Bryan, 524 U.S. at 192, 118 S.Ct. 1939.[12] Knowledge of the law is not an element of a general intent offense. Every citizen is charged with knowing the law, i.e., ignorance of the law is never an excuse. Id. In short, "knowingly" when used in a standard general intent crime means knowing the facts, though not necessarily the law, that constitutes the offense. Morissette v. United States, 342 U.S. 246, 254, 72 S.Ct. 240, 96 L.Ed. 288 (1952).
Succinctly explained in United States v. Crowder, 656 F.3d 870, (9th Cir. 2011), which involved the Sex Offender Registration and Notification Act (SORNA), any person who "knowingly" fails to register or update a registration as required by SORNA, means: 1) knowledge that he had to register and knowledge that he had not registered. It did not require any knowledge of SORNA registration requirements.
Most recently, the Supreme Court explained " 'the presumption in favor of a *799 scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct,' [which in the context of making threatening communications,] requires proof that a communication was transmitted and that it contained a threat. And, because 'the crucial element separating legal innocence from wrongful conduct' is the threating nature of the communication the mental state requirement must apply to the fact that the communication contains a threat." Elonis v. United States, --- U.S. ----, 135 S.Ct. 2001, 2003, 192 L.Ed.2d 1 (2015) (quoting United States v. X-Citement Video, Inc., 513 U.S. 64, 72-73, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) ). In addition to Staples, the other seminal cases relied on by the DOJ are Flores-Figueroa v. United States, 556 U.S. 646, 129 S.Ct. 1886, 173 L.Ed.2d 853 (2009) and Liparota v. United States, 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985).
In Liparota, the Court rejected a narrow application of "knowingly" to only the surrounding verbs in a food stamp statute prohibiting the "knowing" use, transfer, acquisition, alteration, or possession of coupons in any manner not authorized by law "because that would allow the conviction of a person who knowingly acquired or possessed food stamps (which was not itself a crime), but was unaware of the facts making their acquisition or possession a crime." Crowder, 656 F.3d at 874 (citing Liparota, 471 U.S. at 426, 105 S.Ct. 2084 ). "Absent contrary congressional intent, the Court explained, it would not interpret 'knowingly' in a manner so as to 'criminalize a broad range of apparently innocent conduct.' " Id. (quoting X-Citement Video , 513 U.S. at 69, 115 S.Ct. 464 ).
In X-Citement Video, the Court rejected "an interpretation that would have allowed the conviction of a person who knowingly transported videos but was unaware that the videos showed minors engaged in sexually explicit conduct (the element that made the offense a crime), because it would be contrary to the presumption that Congress intends 'some form of scienter' in a criminal statute)." Crowder, 656 F.3d at 874. The Court discussed the constitutional presumption, in absence of express contrary intent, for some modicum of mens rea in criminal statutes which are akin to common-law offenses against the "state, the person, property, or public morals" in comparison to public welfare statutes that are excepted from the principle favoring scienter. X-Citement Video, 513 U.S. at 71, 115 S.Ct. at 469 (quoting Morissette, 342 U.S. at 255, 72 S.Ct. 240 ).
In X-Citement Video , the Court looked at Staples , where the statute was silent, but the Court nevertheless had held a defendant must know that his weapon possessed automatic firing capability so as to make it a machinegun as defined by the National Firearms Act (NFA). In Staples the Court was concerned with criminalizing behavior that fell within a long tradition of widespread lawful gun ownership by private individuals and the harsh penalties for violations of the NFA as distinguished from United States v. Freed, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971) where the Court had earlier looked at the NFA prohibition against receiving or possessing a firearm which is not registered to him. In Freed, the defendant knew he possessed hand grenades, and the Court held that the government was not required to prove the defendant knew that the hand grenades had to be registered because it would surprise no one to learn that possession of a hand grenade is not an innocent act." The question in Staples was whether the defendant must know of the particular "automatic-weapon" characteristics that make his weapon a statutory firearm. The Court answered in the affirmative because criminalizing the possession of all guns, unlike possession of hand grenades *800 which was itself a crime, would "criminalize a broad range of apparently innocent conduct." X-Citement Video , 513 U.S. at 72, 115 S.Ct. 464 (citing Staples, 511 U.S. at 610, 114 S.Ct. 1793 ).
Relying on its characterization in Morissette, 342 U.S. at 256, 72 S.Ct. 240, of public welfare offenses that do not require the defendant to know the facts that make his conduct fit the definition of the offense, the Court noted their general description as strict liability offenses, but clarified this as a misnomer because the defendant must know he is dealing with a dangerous and/or highly regulated item. Staples, 511 U.S. at 607 n. 3, 114 S.Ct. 1793. So for example, a person may not violate a public welfare statute against shipping acid if he or she mistakenly thought he or she was shipping distilled water. United States v. International Minerals & Chemical Corp. (International Minerals), 402 U.S. 558, 563-564, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971).
Similarly, under ESA Section 11, a defendant could only claim accident or mistake if he did not intend to discharge his firearm, or the weapon malfunctioned, or similar circumstances occurred. St. Onge, 676 F.Supp. at 1045, see also McKittrick, 142 F.3d at 1177 (section 11 only requires McKittrick knew he was shooting an animal, and that animal turned out to be a protected gray wolf).
Comparing the relatively small penalties where conviction does not do grave damage to an offender's reputation, which is generally found in public welfare offenses, the Supreme Court in Staples questioned punishing as a felony, with a heavy prison sentence, possession of an unregistered firearm as being incompatible with the public welfare doctrine. The Court declined to adopt a definitive rule that "absent a clear statement by Congress that mens rea is not required," the public welfare offense rational will not apply to interpret any statute defining a felony offense. Instead, the Court simply held it would not dispense with mens rea where such dispensation would require the defendant to have knowledge only of traditionally lawful conduct, with an accompanying severe penalty. Staples, 511 U.S. at 618, 114 S.Ct. 1793. "In such a case, the usual presumption that a defendant must know the facts that make his conduct illegal should apply." Id. at 619, 114 S.Ct. 1793.
In X-Citement Video, the Court applied these principals from Staples and found persons do not harbor settled expectations that the contents of magazines and film are generally subject to stringent public regulation; First Amendment constraints presuppose the opposite. Noting that harsh penalties apply of up to 10 years imprisonment as well as substantial fines, the Court found that Staples instructs that the presumption in favor of a scienter requirement must apply to each of the statutory elements that criminalize this otherwise innocent conduct. Like Staples where the feature of the firearm described in the Act was such an element, the Court in X-Citement Video found the age of minority indisputably possessed the status of an elemental fact requiring scienter because non-obscene, sexually explicit materials involving persons over the age of 17 are protected by the First Amendment and it is not criminal to transport them. X-Citement Video, 513 U.S. at 70-72, 115 S.Ct. 464, but see below Flores-Figueroa, Alito J., concurring in part.
Flores-Figueroa involved enhanced penalties under an identity theft statute for offenders who "knowingly" transfer, possess, or use, without lawful authority, a means of identification of another person. The Court rejected the interpretation that knowingly only applied to transfer, possess, or use "something" without lawful authority. The court required a showing *801 that the defendant knew the "something" was a means of identification. The Court held "means of identification" was an element of the offense. In Flores-Figueroa, Justice Alito, concurring in part and concurring in the judgment, expressed concern that it would be "cited for the proposition that the mens rea of a federal criminal statute nearly always applies to every element of the offense." Flores-Figueroa, 556 U.S. at 659, 129 S.Ct. 1886 (Alito J., concurring in part). He wrote separately to clarify that this general presumption is the beginning point for constructing criminal statutes, and "it must be recognized that there are instances in which context may well rebut that presumption." Id.
He noted:
For example, 18 U.S.C. § 2423(a) makes it unlawful to "knowingly transpor[t] an individual who has not attained the age of 18 years in interstate or foreign commerce ... with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense." The Courts of Appeals have uniformly held that a defendant need not know the victim's age to be guilty under this statute. See, e.g., United States v. Griffith , 284 F.3d 338, 350-351 (C.A.2 2002) ; United States v. Taylor , 239 F.3d 994, 997 (C.A.9 2001) ; cf. United States v. Chin , 981 F.2d 1275, 1280 (C.A.D.C.1992) (R. Ginsburg, J.) (holding that 21 U.S.C. § 861(a)(1), which makes it unlawful to "knowingly and intentionally ... employ, hire, use, persuade, induce, entice, or coerce, a person under eighteen years of age to violate" drug laws, does not require the defendant to have knowledge of the minor's age). Similarly, 8 U.S.C. § 1327 makes it unlawful to "knowingly ai[d] or assis[t] any alien inadmissible under section 1182(a)(2) (insofar as an alien inadmissible under such section has been convicted of an aggravated felony) ... to enter the United States." The Courts of Appeals have held that the term 'knowingly' in this context does not require the defendant to know that the alien had been convicted of an aggravated felony. See, e.g., United States v. Flores-Garcia , 198 F.3d 1119, 1121-1123 (C.A.9 2000) ; United States v. Figueroa , 165 F.3d 111, 118-119 (C.A.2 1998).
Id. at 660, 129 S.Ct. 1886.
The majority "approvingly cited Justice Alito's concurrence for the proposition that "the inquiry into a sentence's meaning is a contextual one." United States v. Washington , 743 F.3d 938, 942-43 (4th Cir. 2014) (citing Flores-Figueroa, 556 U.S. at 652, 129 S.Ct. 1886 ). "The majority noted that some statutes may "involve special contexts or themselves provide a more detailed explanation of background circumstances," id., that call for a result different from the ordinary grammatical reading of statute's use of the word "knowingly" as applying to all subsequently listed elements of a crime. Id. (citing Flores-Figueroa, 556 U.S. at 650, 129 S.Ct. 1886.
The Supreme Court has not foreclosed public welfare offenses, and the Court turns to the question of whether ESA's enforcement provision, Section 11, is such a statute.
3. ESA Section 11, 16 U.S.C. § 1540, is a public welfare offense
Public welfare offenses, created by regulatory statutes, arose from the industrial revolution and in response to previously unimagined risks to people's health and welfare such as industrial accidents, high-speed automobiles, contaminated food and dangerous pharmaceutical drugs. Morissette, 342 U.S. at 254, 72 S.Ct. 240"Such dangers [had] engendered increasingly numerous and detailed regulations which heighten[ed] the duties of those in control of particular industries, trades, properties *802 or activities that affect public health, safety or welfare." Id. With many of these duties being sanctioned by more strict civil liability, lawmakers, "whether wisely or not, [ ] sought to make such regulations more effective by invoking criminal sanctions to be applied by the familiar technique of criminal prosecutions and convictions." Id. at 254-55, 72 S.Ct. 240.
These offenses are not in the nature of positive aggressions or invasions such as those traditionally dealt with at common law; instead they are in the nature of neglect where the law requires care. Id. at 256, 72 S.Ct. 240. "Many violations of such regulations result in no direct or immediate injury to person or property but merely create the danger or probability of it which the law seeks to minimize." Id. Regardless of the intent of the violator, "the injury is the same, and the consequences are injurious or not[,] according to fortuity." Id. The defendant does not need to will the violation, it is enough that he "is in a position to prevent it with no more care than society might reasonably expect and more exertion than it might reasonably exact from one who assumed his responsibilities." Id. Not without misgivings, alleviated to some extent because the generally light penalty provisions of small fines and short jail terms do little damage to an offender's reputation, the courts construed these "statutes and regulations which make no mention of intent as dispensing with it and hold that the guilty act alone makes out the crime." Id.
In the Ninth Circuit, the criminal provisions in the Clean Water Act (CWA) have been held to constitute public welfare offenses because they were clearly designed to protect the public at large from potentially dire consequences of water pollution. United States v. Hanousek, 176 F.3d 1116, 1121 (9th Cir. 1999) (citing United States v. Weitzenhoff, 35 F.3d 1275, 1286 (9th Cir. 1993) )). In Hanousek, the court upheld criminal penalties imposed for negligently discharging a harmful quantity of oil into navigable water. In part, the Ninth Circuit looked at the plain language of the statute, but it also concluded the public welfare statute could place "the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger." Id. at 1122.
To the contrary, the Fifth Circuit has held that the CWA required a discharge of oil be done knowingly where the defendant argued he believed he was discharging water. United States v. Ahmad, 101 F.3d 386 (5th Cir. 1996). The court found that language in the CWA, which makes a knowing violation of the CWA a felony, was "less than pellucid." The principal issue in Ahmad was to which elements of the offense the modifier "knowingly" applied. Id. at 389-90. The court applied Staples and X-Citement Video and held that it seemed "eminently sensible" that the phrase "knowingly violates," when referring to other provisions that define the elements of the offenses, should uniformly require knowledge as to each of those elements. The Fifth Circuit rejected the government's assertion that the CWA created a public welfare offense because even though gasoline is a potentially harmful or injurious item, it is certainly no more so than a machinegun, dispensing with mens rea for each element would criminalize traditionally lawful conduct such that a person who honestly and reasonably believes he is discharging water may find himself guilty of a felony if the substance turns out to be something else. Noting that public welfare offenses have virtually always been crimes punishable by relatively light penalties such as fines or short jail sentences, the court rejected the characterization of the CWA as a regulatory public welfare statute because it invoked substantial terms of imprisonment. Id. at 391.
*803 In Hanousek, the Supreme Court denied certiorari, but Justice Thomas and O'Connor dissented from the denial and wrote to express concern that the Ninth Circuit based its decision in part on its conclusion that the CWA was a public welfare statute. Noting that the circuits were divided on the subject, Justice Thomas wrote, and O'Connor joined, that certiorari should be granted to delineate that the public welfare doctrine does not apply if it would expose countless numbers of people to heightened criminal liability for using ordinary devices to engage in normal industrial operations. Hanousek v. United States, 528 U.S. 1102, 120 S.Ct. 860, 145 L.Ed.2d 710 (2000) (relying on Staples, 511 U.S. at 611, 114 S.Ct. 1793 (finding that "even dangerous items can, in some cases, be so commonplace and generally available that their regulation would not fall within the public welfare doctrine).
The take away from Ahmad and Hanousek for the ESA in respect to its offense language, which is similar to that in the CWA, is that it is "less than pellucid," especially in respect to the issue of whether "knowingly" applies to every element of the offense and specifically whether it applies to the fact that constitutes the offense. Here, it is a violation of Section 9 to take a wildlife species listed as protected (endangered or threatened) under the ESA. In a general intent offense the element of "knowingly" does not require knowledge of the law. Therefore, according to the DOJ, a defendant must know the biological species, but need not know that that species is listed as protected under ESA.
On the other hand, if "knowingly" only modifies the conduct of "taking," the statute exposes innocent people to heightened criminal liability for engaging in otherwise lawful conduct such as harassing, harming, pursuing, hunting shooting, wounding, trapping, capturing, etc. wildlife. The ESA, unlike the CWA, creates misdemeanor penalties, not felonies for committing this otherwise lawful conduct.
In International Minerals , the Court construed a statute imposing criminal penalties on those who "knowingly violate[d]" Interstate Commerce Commission ("ICC") regulations, a short-cut reference for the regulations governing the transport of corrosive liquids, 18 U.S.C. § 834(f) (1970) (repealed 1979). The Court stated that "where ... dangerous or deleterious devices or products or obnoxious waste materials are involved, the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation." International Minerals, 402 U.S. at 565-65, 91 S.Ct. 1697. Applying this presumption of awareness, the Court concluded that knowingly applies only to the specific acts or omissions which violate the Act because there is no exception to the rule that ignorance of the law is no excuse. Id. at 562, 91 S.Ct. 1697.
Justices Stewart, Harlan, and Brennan dissented because the majority opinion in International Minerals essentially wrote the word "knowingly" out of the statute creating a species of absolute liability for regulatory violations in a highly regulated industry. The dissenting Justices supposed this might likely have been Congress' intent because triers of fact will have no problem inferring knowledge by those whose business it is to know, despite protestations to the contrary. Therefore, the only real impact from the law falls on the casual shipper, who has never heard of the regulation and will naturally assume that he could deliver the article to a common carrier and depend upon the carrier to see it is properly labeled and shipped. The majority decision made such a causal shipper guilty of a criminal offense punishable by a year in prison.
*804 International Minerals , 402 U.S. at 568-569, 91 S.Ct. 1697 (Stewart, J., joined by Harlan and Brennan, dissenting).
Accordingly, a public welfare offense will, in all likelihood, impose liability upon at least some innocents-after all it is the purpose of such a regulatory statute, through its quasi-strict liability construct, to "heighten the duties of those in control of particular industries, trades, properties or activities that affect public health, safety or welfare." Staples, 511 U.S. at 629, 114 S.Ct. 1793 (Stevens J., dissenting, Blackmun J., joining dissent (quoting Morissette, 342 U.S. at 254, 72 S.Ct. 240 )). In such situations, the Supreme Court has reasoned that "as long as a defendant knows that he is dealing with a dangerous device of a character that places him "in responsible relation to a public danger, [ United States v. ] Dotterweich, [320 U.S. 277,] 281 [64 S.Ct. 134, 88 L.Ed. 48 (1943) ], he should be alerted to the probability of strict regulation, and we have assumed that in such cases Congress intended to place the burden on the defendant to ascertain at his peril whether [his conduct] comes within the inhibition of the statute, [ United States v. ] Balint, [258 U.S. 250,] 258 [42 S.Ct. 301, 66 L.Ed. 604 (1922) ]." Staples, 511 U.S. at 607, 114 S.Ct. 1793. "Under such statutes we have not required that the defendant know the facts that make his conduct fit the definition of the offense." Staples, 511 U.S. at 607 n. 3, 114 S.Ct. 1793.
Defendants ask the Court to re-look[13] at United States v. Lynch, 233 F.3d 1139 (9th Cir. 2000). In Lynch the court considered the Archeological Resources Protection Act (ARPA), a felony, which prohibits any person from excavating, removing, damaging, or otherwise altering or defacing any archeological resource located on public lands or Indian lands unless the activity is pursuant to a permit. Id. at 1141 (citing 16 U.S.C. § 470ee(a) ). Specifically, the court considered the meaning of "knowingly" violates any prohibition contained in the ARPA, id. (citing 16 U.S.C. § 470ee(d) ), a provision which imposes fines of $10,000 or imprisonment not more than one year, or both, and increases the penalty to fines of not more than $20,000 or imprisoned not more than two years, or both, if the commercial or archaeological value of the archeological resource exceeds the sum of $500.
In Lynch , a young man found a human skull partially buried in a rocky hillside in a native village in Alaska, he picked it up and took it home. Subsequent to turning the skull over to federal authorities, the skull was examined by experts, including carbon dating, and found to by 1400 years old. The costs associated with the investigation and restoration of the site exceeded $7,500.00. The skull was, therefore, an archeological resource under the ARPA because it was over 100 years old, and the penalty was increased because the archaeological value of the skull exceeded $500. Id. at 1140 (citing 16 U.S.C. § 470bb(1) ).
The defendant argued the offense required proof of specific intent, i.e., that Lynch knew he was breaking the law. The government argued, and the trial court agreed, that the mens rea was "malum in se," taking a skull was a wrong in itself. Id. at 1141. The appellate court rejected both parties' positions.
The court rejected Lynch's argument that the statute required proof of specific intent because there was no use of the word "willful" and there was no "clear Congressional intent" to require a showing of knowledge that one's actions are against the law." In fact, the legislative history was to the contrary. The Report accompanying *805 the house bill expressly stated, "This section also provides criminal penalties for those who 'knowingly' commit one of the prohibited acts. This is a general intent crime, and therefore a person could be convicted if he acted of his own volition and was aware of the acts he was committing." Id. at 1142-43 (citing H.R. Rep. No. 96-311, at 11 (1979)). The statute expressly established penalties for those who "knowingly" violate any prohibition under the law, but did not imply that knowledge of the law is required. In other words, such shorthand references do not signal an exception to the rule that ignorance of the law is no excuse. Id. at 1141 (citing International Minerals , 402 U.S. at 561, 91 S.Ct. 1697 ).
The court turned to the government's assertion of "malum in se " that there was no mens rea required because the statute did not reach " 'otherwise innocent conduct' because 'any person on public land cannot believe that removal of an artifact, human or otherwise, can be accomplished legally without some type of regulation.' " Id. at 1144. "The average citizen may be expected to know that the Administrative Society has become so pervasive that in a national forest everything that is not expressly permitted must necessarily be forbidden." The court found the legislative history seemed to belie the government's claim because the congressional record was replete with concerns over prosecution of casual visitors, such as boy scouts, civic groups, and the like, who innocently stumble across an artifact and decide to keep it. Id. at 1142 (citing 125 Cong. Rec. H17391, 17394 (daily ed. July 9, 1979) (statement by Rep. Udall, bill sponsor); Archaeological Resources Protection Act of 1979: Hearing on S. 490 Before the Subcomm. On Parks, Recreation and Renewable Resources, 96th Cong. 96-26 (1979) (statement by Sen. Domenici)).
Applying Morissette, Staples, and X-Citement Video, the court concluded that knowledge of the law is not necessary, but knowledge of the facts that make a trespass a felony is necessary. Id. at 1143. "For a felony conviction, the prosecution should have to prove that a person charged under ARPA knew, or at least had reason to know, that the object taken is an 'archeological resource.' " Id. In other words, the defendant must " 'know the facts that make his conduct illegal.' " Id. at 1143 (quoting Staples, 511 U.S. at 606, 114 S.Ct. 1793 ).
The court in Lynch distinguished the ARPA's criminalization of taking a skull from public welfare statutes that generally criminalize far less innocent conduct, such as a statute proscribing the destruction of government property by fire were arson is not innocent conduct, United States v. LaPorta, 46 F.3d 152 (2nd Cir. 1994), rev'd on other grounds Sicurella v. United States, 157 F.3d 177 (2nd Cir. 1998) ; or an offense for assaulting a federal officer without knowing the officer is a federal agent where there is an intent to assault, United States v. Feola , 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975), and United States v. Sablan, 92 F.3d 865 (9th Cir. 1996), where a computer fraud statute penalized the destruction of government files with only a showing of intent to access a federal interest computer because accessing the computer is already a violation. Id. at 1144.
The court rejected the government's reliance on McKittrick, first, because the legislative history of ESA reflected that Congress intended "to halt and reverse the trend toward species extinction, whatever the cost. " Id. at 1145 (citing McKittrick and quoting United States v. Ivey, 949 F.2d 759, 766 (5th Cir. 1991) (emphasis in Lynch ). Whereas, "the legislative history [of the ARPA] suggests that Congress was *806 concerned about the risk of penalizing archeologically naïve visitors to public lands. Id. Second, the court distinguished McKittrick because it involved misdemeanor penalties as compared to felony penalties imposed under the ARPA. Id. (citing Morissette, 342 U.S. at 260, 72 S.Ct. 240 ).
It is undisputed that the ESA penalty provisions are weak, containing only misdemeanor criminal provisions. (Ps' MSJ, SOF, Ex. 2: United States Attorneys' Bulletin, July 2011, at 46.) In the Ninth Circuit, the misdemeanor offense for taking a threatened species has been determined to be a petty offense. United States v. Clavette, 135 F.3d 1308 (9th Cir. 1998). "The Supreme Court has held as a matter of constitutional law that 'petty' offenses may be tried without a jury." Id. at 1309 (citing Frank v. United States, 395 U.S. 147, 148, 89 S.Ct. 1503, 23 L.Ed.2d 162 (1969). The court explained: "The test for determining whether a particular offense is 'petty' is an objective one, focusing on the severity of the penalty authorized. Any crime punishable by a prison sentence of more than six months is serious, triggering the Sixth Amendment right to trial by jury. Any offense punishable by a prison term of six months or less is presumed to be petty. This presumption may be overcome if there are objective indications that the legislature regards the offense as serious." Id. (citations omitted).
In Clavette, 135 F.3d 1308 (9th Cir. 1998), the Ninth Circuit was asked to decide whether shooting a grizzly bear entitled a defendant to a jury trial. The discussion and decision in Clavette is directly applicable here because the grizzly bear is another species like the Mexican gray wolf, governed by the ESA provisions at issue here. In Clavette, the court affirmed the defendant's conviction without a jury and also considered the evidence sufficient to support the jury's finding of guilt beyond a reasonable doubt, that: 1) defendant knowingly killed a bear; 2) the bear was a grizzly, 3) defendant had no permit to kill a grizzly bear, and 4) defendant did not act in self-defense. Clavette is in keeping with the elements of the offense reflected in the jury instruction approved in McKittrick for the same violation of the same ESA regulation as applied to the listed species, the Mexican gray wolf.
Without expressly identifying the ESA as a public welfare regulatory statute, the Ninth Circuit in McKittrick relied on two district court cases, St. Onge and Billie, which treated the ESA like a regulatory public welfare act.
In Billie, the defendant was charged with taking a Florida panther, an endangered species. He argued that the government was required to prove that he knew the animal he shot was a Florida panther, as opposed to a nonendangered species of panther. The court rejected this argument and ruled that the government "need prove only that the defendant acted with general intent when he shot the animal in question." Billie, 667 F.Supp. at 1493. The court in Billie reasoned that the ESA is a regulatory statute, enacted to conserve and protect endangered species, and that its purposes would be eviscerated if the government had to prove that the hunter recognized the particular subspecies protected under the Act. Id. at 1492-93.
In St. Onge, the issue was whether the government must prove the defendant knew he was shooting a grizzly bear at the time he pulled the trigger, or whether the government need only prove that he knowingly shot an animal which turned out to be a grizzly bear. The court in St. Onge found that the court's construction of the "knowingly" requirement in Billie would best give effect to the regulatory and protective nature of the ESA. "The purposes of the Endangered Species Act would be thwarted if the court were to adopt the *807 defendant's construction of the Act. The critical issue is whether the act was done knowingly, not whether the defendant recognized what he was shooting. The scienter element applies to the act of taking; thus, defendant could only claim accident or mistake if he did not intend to discharge his firearm, or the weapon malfunctioned, or similar circumstances occurred. Given the regulatory nature of the Act, and its broad purposes to protect listed species, the government cannot be required to prove that he had the specific intent to take a grizzly bear." St. Onge, 676 F.Supp. at 1045.
The Supreme Court has not foreclosed public welfare offenses, and in the Ninth Circuit under McKittrick, the ESA penalty provision, Section 11, has been treated like a public welfare offense that does not require knowledge of every fact of the offense. At a minimum, the McKittrick policy rewrites the law in the Ninth Circuit. The DOJ is not, however, bound by McKittrick outside the Ninth Circuit.
4. DOJ's argument: "knowingly" applies to every element of the offense.
According to the Defendants the severity of the potential penalty is the only distinction proposed by the Plaintiffs for departing from the presumptive mens rea requirement of knowing the facts that constitute the offense. Defendants argue that severity of the penalty can be a factor in determining Congressional intent, but no such inquiry is required here because the statute is clear on its face and requires a "knowing violation." Defendants submit that the Supreme Court is unlikely to conclude that the meaning of "knowingly" varies with the penalty. (D's Objection (Doc. 89) at 22.)
The Court does not agree that the statute is clear on its face. This Court agrees with the Fifth Circuit Court of Appeal's conclusion in Ahmad, 101 F.3d at 389, which held identical language in the CWA is "less than pellucid."
Section 11, 16 U.S.C. § 1540, prohibits violations of the ESA and its regulations, which is a "shortcut" reference to Section 9, 16 U.S.C. § 1538, which prohibits taking of endangered and threatened species listed pursuant to § 1533 of the Act, a subsequent but not so short shortcut reference to Section 3, 16 U.S.C. § 1538, which defines taking as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct" and to the various species listed pursuant to ESA regulations, including 50 C.F.R. § 17.84(k) for the Mexican wolf. ESA is not a statute like the aggravated identity theft offense considered by the Court in Flores-Figueroa, which stated all its elements in one sentence: "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person." It is not nearly as clear here that "as a matter of ordinary English grammar, it would be natural to read the term "knowingly" as applying to various wildlife biological species.
The statute is silent regarding any mens rea related to the various wildlife species listed under ESA as endangered and threatened. Knowledge of the law is never a requirement, and DOJ's instruction reflects this: "the term knowingly does not require the government to prove that the defendant knew that the animal in question was protected under federal law, that the act he knowingly committed constituted a violation of the law, or that his conduct was illegal or unlawful. The DOJ instructs that the jury must find beyond a reasonable doubt that the defendant did knowingly take a wolf, and that an act is done knowingly, "if the defendant is aware of the act and does not act through ignorance, mistake, or accident." The DOJ's deliberate ignorance instruction precludes *808 finding the defendant acted knowingly, if the defendant actually believed the animal was not a wolf or acted based on negligence, mistake or carelessness. The DOJ's instruction requires proof that the defendant knew the biological species taken, i.e., shot, was a wolf, but need not know shooting a wolf is illegal.
Requiring that the shooter know the biological species of the animal comes perilously close to requiring specific intent, the very mens rea that Congress intended to amend in 1978 when it changed "willfully" to "knowingly." Stated best by Defendant-Intervenors, the New Mexico Cattle Growers, "[t]he difference between the two types of crimes is whether the defendant's conscious purpose was to cause the forbidden effect (specific intent) or not (general intent)." (N. Mex. Response (Doc. 93) at 12 (citing Dixon v. United States, 548 U.S. 1, 5-6, 126 S.Ct. 2437, 165 L.Ed.2d 299 (2006).) Putting this in perspective, willfulness would require proof the defendant shot an animal intending to shoot a wolf. The Court has a hard time distinguishing this from the "McKittrick policy-knowingly" instruction which requires proof the defendant knowingly shot an animal knowing it was wolf. The latter is proof of the former so that under the McKittrick policy, the government has proved specific intent.
This standard of proof is in stark contrast to Supreme Court acceptance of lesser mens rea to support criminal offenses, even felony offenses. So for example, in 2015 in Elonis, the Supreme Court considered 18 U.S.C. § 875(c), which makes it a felony to transmit in interstate commerce "any communication containing a threat ... to injure the person of another." Elonis, 135 S.Ct. at 2007-2013. The statute was silent so the Supreme Court focused on the mens rea necessary to separate wrongful conduct from otherwise innocent conduct, and applied the presumption that scienter is required for each statutory element criminalizing otherwise innocent conduct. The Court held the crime required proof that the defendant, in making the allegedly threatening internet postings, knew the communications would be viewed as a threat. The Court reversed the conviction which was based on a negligence standard of whether a reasonable person would foresee his postings would be viewed as threats by other reasonable persons. In Elonis, the Supreme Court held that negligence is not sufficient to prove conscious wrongdoing. The majority declined to address whether a mental state of recklessness would suffice to support the defendant's conviction. Id.
Justice Alito, concurring in part and dissenting in part, wrote in relevant part, that recklessness is enough. Id. at 2014 (Alito, J., concurring in part). Agreeing negligence to be an insufficient mens rea to support criminal liability, Justice Alito explained that "in the hierarchy of mental states, the mens rea just above negligence is recklessness. Id. at 2015 (Alito, J., concurring). "Negligence requires only that the defendant 'should [have] be[en] aware of a substantial and unjustifiable risk," ALI, Model Penal Code § 2.02(2)(d), p. 226 (1985), while recklessness exists 'when a person disregards a risk of harm of which he is aware,' Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). " Id. Where Congress does not specify a mens rea in a criminal statute, there is no room for inferring that anything more than recklessness is needed. "There can be no real dispute that recklessness regarding a risk of serious harm is wrongful conduct." Id. (including reference to a wide variety of contexts describing reckless conduct as morally culpable) (citations omitted), cf. , Voisine v. United States, --- U.S. ----, 136 S.Ct. 2272, 195 L.Ed.2d 736 (2016) (holding reckless *809 domestic assault qualifies as misdemeanor crime of violence under 18 U.S.C. § 922(g) prohibiting firearm possession by person convicted of such a misdemeanor if committed against a domestic relation that necessarily involves the use of physical force, i.e., reckless use of force sufficient to support conviction). In Elonis, Justice Alito wrote: "Someone who acts recklessly with respect to conveying a threat necessarily grasps that he is not engaged in innocent conduct. He is not merely careless. He is aware that others could regard his statements as a threat, but he delivers them anyway." Id. at 2015.
With Justice Alito's concurrence in mind, if the mens rea presumption applies like DOJ argues it does, the jury instruction would be: the defendant knowingly committed the taking, i.e., shooting, with reckless disregard for the biological identity of the species. But, this Court does not believe the presumption applies. Even in Elonis, the Supreme Court relied on the general rule, noting "although there are exceptions." Id. at 2009.
The Defendants are wrong in believing that the Supreme Court would look only at the plain meaning of the word "knowingly" and not consider its use in the special context of the ESA. As noted in this Order, as far back as 1978 in its decision in TVA v. Hill, the Supreme Court recognized the special nature of the ESA as being the most comprehensive legislation ever enacted by any nation to preserve endangered species. Supra at 792. The Supreme Court has recognized Congress' intent to create a statutory conservation scheme to halt and reverse the trend toward extinction. Id.
In Sweet Home, the Supreme Court, addressed whether habitat modification can constitute "harm" within the meaning of a take and concluded habitat modification is a take if it actually kills or injures wildlife. The Court reasoned the broad purpose of ESA created liability for indirect takings through destruction of habitat as well as direct takings such as shooting or killing a protected species. Babbitt v. Sweet Home Chapt. of Communities for a Great Oregon, 515 U.S. 687, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995).
The Supreme Court held that express provisions of the Act, itself, supported the conclusion affirming a regulation adopted by the Secretary, which interpreted the ESA as reaching indirect and direct takings. Sweet Home, 515 U.S. at 697, 115 S.Ct. 2407. First, the ordinary meaning of "harm" encompasses habitat modification that indirectly causes actual injury or death to members of an endangered or threatened species. Unless "harm" encompasses indirect as well as direct injuries, the word has no distinct meaning and is duplicative of other conduct defined as a "take." Id. Second, Section 2, 16 U.S.C. § 1531(b), expressly states its broad purpose is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved...." Id. at 698, 115 S.Ct. 2407. Section 7 applies to actions "likely to jeopardize the continued existence of any endangered species or threatened species, 16 U.S.C. § 1536(a)(2), and thereby requires federal agencies to avoid harm. Id. at 704, 115 S.Ct. 2407. And, Section 9, the ESA provision which authorizes the Secretary to issue "incidental take" permits, 16 U.S.C. § 1539(a)(2)(A) requires the applicant to prepare a "conservation plan" that specifies how to minimize and mitigate the impact of the otherwise lawful activity on endangered and threatened species. Id. at 700, 115 S.Ct. 2407. The Supreme Court found that Section 7 made "clear that Congress had in mind foreseeable rather than merely accidental effects on listed species." Id. at 701, 703, 115 S.Ct. 2407.
*810 Again, like it did in TVA , the Supreme Court concluded ESA's legislative history reflected that Congress intended the take provision to sweep broadly to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." Id. at 704, 115 S.Ct. 2407 (quoting S.Rep. No. 93-307, p. 7 (1973). U.S.Code Cong. & Admin.News 1973, pp. 2989, 2995). "The House Report stated that "the broadest possible terms" were used to define restrictions on takings. H.R.Rep. No. 93-412, p. 15 (1973). "The House Report underscored the breadth of the 'take' definition by noting that it included 'harassment, whether intentional or not. ' " Id. at 705, 115 S.Ct. 2407 (quoting with emphasis added H.R.Rep. No. 93-412, p. 11). "The Report explained that the definition 'would allow, for example, the Secretary to regulate or prohibit the activities of birdwatchers where the effect of those activities might disturb the birds and make it difficult for them to hatch or raise their young.' " Id. The Supreme Court held the legislative history supported the Secretary's interpretation that the term "take" in § 9 reached far more than the deliberate actions of hunters and trappers. Id. at 705, 115 S.Ct. 2407.
Justice Scalia, dissenting, found that the ESA definition for taking, including harm, should be interpreted to only include actions directed against, and likely to injure or kill, individual wildlife, such as hunting and killing. He expressed concern that liability under ESA Section 9 for takings caused indirectly by habitat modification, when combined with the penalty provisions for ESA, "produces a result that no legislature could reasonably be thought to have intended: A large number of routine private activities-for example, farming, ranching, roadbuilding, construction and logging-are subjected to strict-liability penalties when they fortuitously injure protected wildlife, no matter how remote the chain of causation and no matter how difficult to foresee (or to disprove) the "injury" may be (e.g., an "impairment" of breeding). " Id. at 721-22, 115 S.Ct. 2407 (Scalia, J., dissenting). Justice Scalia referred to the strict liability civil penalty in 1540(a)(1) which imposes a $500 fine for "any person 'who otherwise violates' the taking prohibition (i.e., violates it unknowingly)[,]" as distinguishable from the more severe penalties for "knowing" violations. Id. at 721-722, 115 S.Ct. 2407 (Scalia, J., dissenting).
The majority, however, discounted scienter concerns because Section 11's penalty provisions expressly provide that "knowing" action is enough to violate the Act, id. at 701-701, 115 S.Ct. 2407, and principals of proximate cause always inject a foreseeability element into every statute, id. at 711-713, 115 S.Ct. 2407 (O'Connor J., concurring).
What is relevant for this Court's inquiry is Justice Scalia's position that Section 9 provides for two distinct mens rea : one being a strict-liability civil penalty and the other being " 'knowing,' mean[ing] that the defendant must 'know the facts that make his conduct illegal.' " Id. at 722, 115 S.Ct. 2407 (quoting Staples , 511 U.S. at 606, 114 S.Ct. 1793 ) (Scalia, J., dissenting). "The hunter who shoots an elk in the mistaken belief that it is a mule deer has not knowingly violated 1538(a)(1)(B) ... because he does not know what sort of animal he is shooting. The hunter has nonetheless committed a purposeful taking of protected wildlife, and would therefore be subject to the (lower) strict-liability penalties for the violation." Id.
This is essentially DOJ's position regarding mens rea , however, Justice Scalia's opinion was not only a dissent, his application of Staples to define "knowingly" in the context of Section 11 was dictum because it was not essential to his determination that "harm" for criminal liability *811 under Section 9 for taking violations must be direct and not indirect harms from habitat modification or destruction. The majority rejected his assertion that the Secretary's regulation dispensed with foreseeability requirements and explained the challenged regulation "merely implemented the statute and was subject to the statute's mens rea of "knowingly violates" and the ordinary requirements of proximate causation and foreseeability. Id. at 700 n 13, 115 S.Ct. 2407. This is enough to satisfy due process. Cf. , United States v. Apollo Energies, Inc., 611 F.3d 679, 690 (10th Cir. 2010) (finding constitutional breaking point is reached when MBTA is stretched to criminalize predicate acts that could not have been reasonably foreseen to result in a proscribed effect on birds).
The DOJ cannot rely on Justice Scalia's dissenting opinion in Sweet Home, especially the DOJ cannot rely on Justice Scalia's application of Staples to the "knowingly violates" language in ESA Section 11, 16 U.S.C. § 1540. The DOJ is bound by the majority opinion in Sweet Home. More importantly, the Supreme Court in Sweet Home did not consider the question, here, which is whether "knowingly violates" applies to all the elements of the offense-specifically whether "knowingly" applies to the biological identity of the wildlife species.
The DOJ has done precisely what concerned Justice Alito and caused him to write a concurring opinion in Flores-Figueroa so that it would not be "cited for the proposition that the mens rea of a federal criminal statute nearly always applies to every element of the offense." Flores-Figueroa, 556 U.S. at 659, 129 S.Ct. 1886 (Alito J., concurring in part). As he explained, this presumption is only the beginning point and there are instances in which context rebuts the presumption. Id. The findings in Sweet Home support the conclusion that Congress intended the ESA to be a public welfare statute and this context rebuts the presumptive mens rea for every fact constituting the offense. In other words, the Government does not need to prove beyond a reasonable doubt that a defendant knows every fact that makes his conduct illegal under the ESA.
The severity of the penalty provision contained in the ESA is important because Congress created only misdemeanor offenses in Section 11, including imprisonment of not more than one year for taking endangered species and a prison term of not more than six months for the petty offense of taking a species listed as threatened. Takings such as those at issue here, which kill wildlife, are not like gun ownership which the Supreme Court found in Staples to be a widespread lawful and unregulated activity. "In fact, FWS regulations which state that even the unintentional killing of a Mexican gray wolf constitutes a prohibited take pursuant to the ESA are entirely consistent with state laws that make hunting offenses strict liability crimes." (Ps' Reply (Doc. 100) at 11 (citing Arizona v. Slayton, 214 Ariz. 511, 154 P.3d 1057, 1062-63 (Ariz. 2007) (finding it is not unreasonable for State to hold applicant for a hunting permit responsible for violating its terms, even if hunter claims ignorance; a hunter is responsible for learning the laws and regulations pertaining to the hunting privilege and capable of preventing his ignorance with no more care and effort than society might reasonably expect from one who assumes hunting responsibilities); New Mexico v. Barber, 91 N.M. 764, 581 P.2d 27 (N. Mex. 1978) (finding spot light act, prohibiting the shining of a spotlight into any area where there is big game or domestic livestock while possessing a firearm, was in the public interest to give law enforcement even break against hunting out of season at night with spotlights to prevent poaching).
*812 "Ordinary care while hunting means a high degree of care, due to the inherent nature of the sport.... Precautions must be taken in accordance with the circumstances in order to avoid actionable fault." Id. (quoting V. Feudo, Hunting Accident Liablity, 13 Clev. Marshall L. Rev. 327 (1964)). It is well settled, that a hunter must exercise due care to identify his target, for if he is in doubt, he must not shoot. " Id. (emphasis added in Reply). Congress intended the ESA to reach otherwise innocent conduct and did so permissibly because it imposed only misdemeanor liability on conduct which a defendant knowingly commits and it would surprise no one to learn such liability exists for mistakenly and/or carelessly killing wildlife. In adopting ESA's public welfare offenses, Congress recognized that killing wildlife is not an entirely innocent act because a killer is knowingly engaged in a lethal activity, using a deadly device, which places him or her in a position of responsibility in relation to the public. Congress placed the burden to know the identity of the wildlife species being killed on the killer.
Only ESA's civil offense includes strict liability for any and all takings without any regard for mens rea. The criminal offenses require the mens rea of knowingly before liability attaches to conduct constituting a taking, such as shooting.[14] There is no criminal liability for an accident, such as if a gun misfires killing wildlife.
The question here is whether knowingly must apply to every element of the offense, especially the fact that separates a wrongful shooting from a lawful one, which is the biological identity of the species. In a public welfare statute, it is enough to know the conduct, i.e., shooting wildlife, involves risky or highly regulated activities, with the burden for any mistake falling on the defendant. Supra at 803. This Court understands Sweet Home to mean that the due process clause is satisfied as long as a defendant proximately caused the statute's violation. " '[P]roximate cause' [is] that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the accident could not have happened, if the injury be one which might be reasonably anticipated or foreseen as a natural consequence of the wrongful act.' " United States v. Apollo Energies, Inc., 611 F.3d 679, 690 (10th Cir. 2010) (quoting Blacks Law Dictionary 1225 (6th ed. 1990), citing Sweet Home, 515 U.S. at 696 n.9, 700 n. 13, 713, 115 S.Ct. 2407 )). Mistakenly shooting a wolf is the reasonably anticipated or foreseen natural consequence of knowingly shooting wildlife. It is the case by case discretion to prosecute "mistaken" shootings which is foreclosed by the McKittrick policy.
The Court finds that Congress believed, rightly or wrongly, that imposing minor criminal penalties on otherwise innocent conduct would promote ESA conservation goals and that placing these burdens on some innocents was appropriate given the nature of the conduct specified in Section 9 and was necessary for the public welfare.
The DOJ's jury instruction and its corresponding interpretation of the law for prosecuting ESA misdemeanor offenses, 16 U.S.C. § 1540(b), including the petty offense, are as a matter of law wrong. The McKittrick policy violates the APA because it is based on the DOJ's incorrect belief that it cannot prosecute mistaken and/or careless wolf takings. The ESA is a public welfare statute and this context defeats *813 the general presumption that mens rea attaches to every fact constituting the offense. Under ESA, it is a misdemeanor offense to knowingly shoot wildlife, if the animal shot is a protected species. Because Congress created this vigorous enforcement scheme to conserve endangered and threatened species, including the Mexican gray wolf, the DOJ has abdicated its statutory responsibility by adopting the McKittrick policy which precludes, without discretion, prosecutions for mistakenly and/or carelessly taking, i.e., shooting, a wolf.
C.
ESA Section 7: Failure to Consult
ESA's comprehensive scheme to protect endangered and threatened species applies to the DOJ as follows:
[S]ection 7(a)(1) of the ESA, 16 U.S.C. § 1536(a)(1), imposes important obligations on all federal agencies, including the DOJ, to conserve listed species: to use their authorities to assure the survival of threatened and endangered species, to protect their critical habitats, and to promote the recovery of the species to the point at which they no longer require the protections of the ESA. To assure compliance with Section 7(a)(1), Section 7(a)(2) mandates a consultation process with the FWS to insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered or threatened species. 16 U.S.C. § 1536(a)(2). Section 7 duties are triggered whenever a federal agency proposes to take a discretionary action that "may affect" threatened and endangered species.
Id. (emphasis added).
The Court dismisses the Section 7 ESA claim because Plaintiffs limited the McKittrick challenge to the Mexican gray wolf, which is a nonessential experimental population of endangered species: the gray wolf. "The Mexican gray wolf or 'lobo,' is 'the smallest, rarest, and most genetically distinct subspecies of gray wolf.' " WildEarth Guardians v. Lane , 2012 WL 6019306, at *1 (D.N.M. Dec. 3, 2012), as amended (Dec. 4, 2012) (quoting WildEarth Guardians v. U.S. Forest Serv. , 668 F.Supp.2d 1314, 1319 (D.N.M.2009) ). "The Mexican gray wolf once numbered in the thousands across much of New Mexico, Arizona, Texas, and northern Mexico until 'federal eradication efforts undertaken to benefit the livestock [industry] indirectly drove the subspecies to near extinction.' " Id. In 1978, the entire gray wolf species was designating endangered, with the subspecies Mexican gray wolf being considered extirpated from its historic range in the south western United States since 1970. A Mexican wolf Recovery Plan was adopted in 1982 to conserve and ensure survival of the Mexican gray wolves by maintaining a captive breeding program to reestablish a viable, self-sustaining population of at least 100 Mexican wolves in a 5,000 square mile area within the subspecies' historic range. Id. at *2.
There are three categories of species protected by ESA, as follows: "1) endangered (in danger of extinction throughout all or a significant portion of its range); 2) threatened (likely to become an endangered species within the foreseeable future, and (3) an essential or experimental, nonessential ("ENE") population (an endangered species or a threatened species outside of the current range of such species)." Id. at *3. " 'Endangered species are entitled to the highest level of protection. Threatened species 'are afforded fewer protections than endangered species.' " Id.
Under Section 10j of the ESA, FWS designates certain reintroduced populations of endangered and threatened species as experimental populations. Id. at *3 (citing 16 U.S.C. § 1539(j) ). An "experimental *814 population" is "any population ... authorized by the Secretary for release ... but only when, and at such times as, the population is wholly separate geographically from nonexperimental populations of the same species." 16 U.S.C. § 1539(j)(1). "The Secretary may authorize the release ... of any population ... of an endangered species ... outside the current range of such species if the Secretary determines that such release will further the conservation of such species." 16 U.S.C. § 1539(j)(2)(A).
As discussed in the preceding section of this Order, experimental populations are treated as if listed as a threatened species for the purpose of establishing protective regulations. 50 C.F.R. § 17.82. FWS has issued a blanket regulation that applies all prohibitions applicable to endangered species to threatened species, unless the agency has issued a special rule for a specific species. 16 U.S.C. § 1539(j)(C) ; 50 C.F.R. § 17.31. Section 10(j), 16 U.S.C. § 1539(j), authorizes the FWS to designate by regulation certain reintroduced populations of endangered and threatened species as experimental populations. Lane, 2012 WL 6019306 *3. Here, the applicable Rule under 10j for the Mexican gray wolf is 50 C.F.R. § 17.84(k).
ESA 10(j), subsection C, provides: "For purposes of this chapter, each member of an experimental population shall be treated as a threatened species; except that-(i) solely for purposes of section 1536 of this title [Section 7 ] ..., an experimental population determined under subparagraph (B) to be not essential to the continued existence of a species shall be treated, except when it occurs in an area within the National Wildlife Refuge System or the National Park System, as a species proposed to be listed under section 1533 of this title; ...." 16 U.S.C. § 1539(j)(C) (emphasis added).
It is undisputed that Mexican gray wolves do not occur in an area within the National Wildlife Refuge System or the National Park System, and they are designated as nonessential to the continued existence of the species. For purposes of Section 7, Mexican gray wolves are treated as a species proposed to be listed, not as a threatened species. Section 7's consultation requirements do not apply to the Mexican gray wolf.
Plaintiffs complain that Defendants and the Intervenors ask the Court "to indulge in a fantasy: specifically, to acquiesce in the fiction that the DOJ's McKittrick Policy was adopted only for application to situations arising from the illegal take of Mexican gray wolves." (Ps' Reply (Doc. 100) at 21.) Plaintiffs correctly posit: "Of course, this is not the case." Id.
The McKittrick policy applies nationwide to all criminal enforcement actions brought under Section 11, not just to taking a Mexican gray wolf. This includes all wildlife species listed as threatened and experimental populations being treated as threatened, such as the grizzly bear.[15] While the Court dismisses the Section 7 claim, it does not mean to suggest that the DOJ was not required to consult with FWS regarding the impact of the McKittrick policy on endangered and threatened species. The Court reaffirms its conclusions that the McKittrick policy was an affirmative, final agency action covered by ESA Section 7. (Order (Doc. 30) at 17-20.)
This case has, however, been narrowed by the Plaintiffs' choice of venue and corresponding representations made in response to Defendants' Motion to Dismiss *815 for Lack of Venue (Order (Doc. 22) at 7), the Second Amended Complaint, the evidence presented in the case, and this Court's equally limited approach to resolving the McKittrick challenge. The Court's conclusion that the McKittrick policy was a wrong statement of the law relied on the intent expressed by Congress in the ESA statutes, including the Final Rule for the Mexican wolf, and the ESA's legislative history. Plaintiffs' Section 7 claim asks the Court to consider an undetermined array of wildlife species, which, assuming Plaintiffs' mean all threatened species, are governed by a vast array of Rules. The Court has only versed itself with the Rule governing the Mexica gray wolf, 50 C.F.R. § 17.84(k). This Court has limited its decision to the Mexican gray wolf because this was the evidence put before it. Under Section 7, there was no duty for DOJ to consult with FWS to insure that the McKittrick policy was not likely to jeopardize the continued existence of the Mexican wolf.
Accordingly,
IT IS ORDERED that the Plaintiffs' Motion for Summary Judgment (Doc. 87) is GRANTED IN PART on Count Two for violations of the Administrative Procedures Act and DENIED IN PART on Count One for ESA Section 7 violations.
IT IS FURTHER ORDERED that the Clerk of the Court shall enter Judgment, accordingly.

The Court notes that the Defendant refers interchangeably to the wolf at issue here as the gray wolf and the Mexican gray wolf. (D's Objection (Doc. 89) at 2) There are two experimental species, the Gray wolf, 50 C.F.R. § 17.84(h) and the Mexican wolf, 50 C.F.R. § 17.84(k). McKittrick was charged with shooting a gray wolf. As the Court understands it, the Mexican wolf is a subspecies of the gray wolf, and is the animal at issue in this case.

The Defendants do not present any new evidence in the Response to Plaintiffs' Motion for Summary Judgment related to standing. The Court again rejects Defendant's argument that prosecutorial discretion precludes this Court's jurisdiction, and correspondingly precludes a finding of redressability. Likewise, the Court again rejects Defendant's argument that there is no causal nexus between less coercive determinative effects of the McKittrick policy and wolf killings. See (Order (Doc. 30) at 4-10) (finding standing exists), cf., (Order (Doc. 83) at 7 (finding standing exists for intervenors due to chilling effect if McKittrick policy invalidated or enjoined). As the causal nexus for standing is minimal, the Court reaffirms without hesitation its finding that Plaintiffs have standing to bring this action.

Big Country was decided in part on a lack of standing and in relevant part explained that Heckler exceptions to the presumption of non-reviewability did not apply because there was a presumption of immunity from review related to agency's decision to not enforce procurement regulations, which was not rebutted because Congress did not limit Dept. of Agriculture's enforcement powers but allowed Secretary to prescribe such regulations as deemed necessary to carry out the school lunch Act; the agency regulations did not limit his enforcement discretion and allowed him to determine failures to comply warranting suspension or termination, including developing preferences for awarding school-milk programs to buy dairy products harvested in state.

The Alternative Fines Act.

The misdemeanor fines for 16 U.S.C. § 1540(b)(1) were misstated in the Order denying the Motion to Dismiss. (Order (Doc. 30) at 16-17.)

Secretary of Interior duties are delegated to the United States Fish and Wildlife Services.

The Court rejects Intervenor Safari's assertion that ESA § 9 take prohibitions do not apply to the Mexican gray wolf because it is a nonessential experimental population and not a threatened species. (Safari Response (Doc. 95) at 11-14.) See 50 C.F.R. § 17.84(k)(3) Definitions (defining take the same as 16 U.S.C. § 1532(19) ) to mean to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct). With respect to experimental populations, Congress authorized in Section 10(j) of the ESA for their designation and regulation by Rule, 16 U.S.C. § 1539(j), and provided that "each member of an experimental population shall be treated as a threatened species, except solely for the purposes of section 7, other than subsection (a)(1), an experimental species determined ... to be not essential ... shall be treated, except when it occurs in an area within the National Wildlife Refuge System or Park Systems, as a species proposed to be listed ...." WildEarth Guardians v. Lane, 2012 WL 6019306 *3-*4 (D.N.M. Dec. 4, 2012) (quoting § 1539(j)(C) ). Safari cannot hang on this narrow Section 7 exception its argument that the Mexican gray wolf, an experimental, nonessential, endangered species should not be treated like a threatened species for the purpose of analyzing Section 9-taking violations. The Court further discusses the exception in the context of Plaintiff's Section 7 claim. The Court does not agree with the District Court finding in Lane that Section 9's prohibition against taking applies only to species listed as threatened and not to species being treated as threatened. Nor does it agree that there is some basis for applying Section 9 differently depending on whether the experimental population is essential or nonessential. Id. at *8-*11. Like Section 9, the Rule precludes intentional and unintentional takings. 50 C.F.R. § 17.84(k)(7)(viii)

50 C.F.R. § 17.84(k)(7)(viii)

Id.

The district court cases relied on in McKittrick distinguished between general and specific intent crimes: United States v. Nguyen , 916 F.2d 1016, 1017-18 (5th Cir.1990) (sustaining possession conviction which did not require that defendant know animal's ESA-protected status); United States v. Ivey , 949 F.2d 759, 766 (5th Cir.1991) (citing St. Onge and Billie in holding that, like § 1540(b)(1), § 1538(c) is a general intent statute); United States v. Grigsby , 111 F.3d 806, 817 (11th Cir.1997) (distinguishing between general intent provisions and specific intent required in African Elephant Conservation Act requires only general intent).

The Court refers to the policy transmitted by DOJ to all prosecuting attorneys in 1999 instructing them that the standard of proof required them to prove beyond a reasonable doubt that a defendant knew the biological species of the animal. (AR (Docs. 75.4-75.7.) Defendants reurge the argument that Plaintiffs claims are barred by a 6-year statute of limitation. There is no basis for the Court to reconsider its previous rejection of this argument. Reconsideration is appropriate only in rare circumstances, such as when the court has patently misunderstood a point, made a decision outside the adversarial issues presented to the court by the parties, made an error not of reasoning but of apprehension, or where there has been controlling or significant change in the law or facts since the submission of the issue to the court. Such problems rarely arise and the motion to reconsider should be equally rare. Above the Belt, Inc. v. Mel Bohannan Roofing, Inc. , 99 F.R.D. 99, 101 (E.D. Va. 1983) ; see also, Sullivan v. Faras-RLS Group, Ltd. , 795 F.Supp. 305, 308-09 (D. Ariz. 1992).
The Court has carefully reviewed the arguments and evidence submitted in respect to urging the statute of limitations defense made by the Defendant in the Motion to Dismiss (Doc. 24) and the Reply (Doc. 28). There is nothing new offered in the Response to the Motion for Summary Judgment, except for the reference in the Chavez Decl. that the FWS discussed the McKittrick policy in its 1999, 2000, 2001, and 2002 annual law enforcement reports. (D's Objection (Doc. 89) at 17 (citing Chavez Decl., Ex. A at 9, 18, 27, 33 (noting FWS development of "proactive programs designed to prevent illegal killings of wolves and grizzly bears" as being "even more valuable, for [DOJ] lawyers now agree that the government will have to prove that defendants knew they were killing a protected animal in order to bring charges for illegal take under the Act.) This is not new evidence of the type needed for reconsideration because it was available to the Defendant when it previously raised the time bar argument. The Court notes that while the FWS law enforcement annual reports cannot support reconsideration of the statute of limitation issue, they do support the Court's affirmation of its standing decision based on a finding that a causal nexus exists between the Defendant's prosecutorial McKittrick policy and illegal killing of wolves.
The remainder of Defendant's statutory bar arguments and evidence presented in the Response to the Plaintiffs' Motion for Summary Judgment were included in the Motion to Dismiss and rejected by the Court's denial of the Motion to Dismiss. Compare (Response (Doc. 89) at 15-18), with (Motion to Dismiss (Doc. 24) at 10-13, 13 (discussing tolling), and Supp. Decl. McArdle (Doc. 29-2 (discussing 2002 other environmental group raising same concerns as Plaintiffs'), and Reply (Doc. 28) at 4-7, 5 (referencing Los Angeles Time ). The Court is not persuaded by Intervenor Safari's evidence that one of WildEarth Guardians' named Plaintiffs for purposes of standing, Peter M. Ossorio, was an Assistant United States Attorney at the time the February 12, 1999, memo was distributed. He joined WildEarth Guardians in 2000, but more importantly the memo distributed to AUSAs merely informed them to discontinue use of the jury instruction used in McKittrick. The memo did not include the jury instruction. "[I]t did not declare it would be [essentially] seeking a specific intent jury instruction for the general intent offense." (Order (Doc. 30) at 21, 23.) The evidence reflects that even now prosecuting attorneys mistakenly seek the McKittrick instruction. (Ps' SOF (Doc. 88), Ex. 3: 2003 Gov't Resp. to Motion for Acquittal or New Trial (relying on McKittrick )).
To be clear, the Court reaffirms its Order issued on July 27, 2015, finding that the Plaintiffs' claims are not barred because the 6-year statute of limitation period began to run in 2012 when Plaintiffs received responses to the FOIA request reflecting the existence of the McKittrick policy. (Order (Doc. 30) at 20-26.)

The McKittrick opinion issued April 28, 1998. The Bryan decision issued June 15, 1998.

See (Order (Doc. 30) at 2 (relying on Lynch to find McKittrick remained good law).

For purposes of discussion, the Court refers to only shooting, which is one of the several express types of conduct defined as a taking in 16 U.S.C. § 1532(19).

In the original Complaint, Plaintiffs included grizzly bears, whooping cranes, California condors, red wolves, Louisiana black bears, and Florida black panthers as affected species. (Complaint (Doc. 1) ¶ 95.)